IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

POWERTRAIN, INC., a Mississippi corporation                    PLAINTIFF

v.                                        CIVIL ACTION NO. 1:11-cv-00105-GHD

JOYCE MA, individually                                          DEFENDANT

## MEMORANDUM OPINION DENYING PLAINTIFF'S MOTION FOR NEW TRIAL

Presently before the Court is a motion for new trial [279] filed by Plaintiff Powertrain, Inc. Defendant Joyce Ma has filed a response, and Plaintiff Powertrain, Inc. has filed a reply. The matter is now ripe for review. Upon due consideration, the Court finds that the motion [279] is not well taken and should be denied.

### A. Factual and Procedural Background

On May 3, 2011, Plaintiff Powertrain, Inc. ("Powertrain") brought this diversity action against Best Machinery & Electrical, Inc. ("Best Machinery"), a dissolved California corporation, and Joyce Ma ("Ma"), a California citizen.[1] This case has been on the Court's docket since that time, approximately three years and nine months.

Service of process was perfected on Best Machinery pursuant to applicable law. However, the Clerk of the United States District Court for the Northern District of Mississippi subsequently entered default [108]; Powertrain filed a motion for default judgment [109] against Best Machinery; and the Court granted default judgment against Best Machinery in the amount of $2,600,000.00, together with interest accruing at the then-current federal rate of 0.13% from

---

[1] Diversity jurisdiction was established in this action, as complete diversity of citizenship existed between the Plaintiff Powertrain, a Mississippi resident, and the Defendants Best Machinery, a California corporation with its principal place of business in California, and Ma, a California resident, and the jurisdictional amount in controversy was satisfied by Powertrain's prayer for damages exceeding $2,000,000. The parties agreed that Mississippi law governed the action.

the date of the Default Judgment until the date it was paid in full. *See* Ct.'s Default J. [124]; Ct.'s Order [117] & Mem. Op. [118] Re: Serv. of Process on Best Machinery.[2] At trial, the only claims remaining were Powertrain's claims against Ma, individually.[3]

Uncontested Facts

The following facts were established by the Pretrial Order:

In 2001, Ma and Oneal Wood, the president of Powertrain, met at a trade show in Las Vegas. Pretrial Order [272] at 3, ¶ 8(a); 5, ¶ 8(b). Subsequently, Powertrain placed orders for Chinese engines through Best Machinery; Best Machinery then ordered the engines from Chinese manufacturers and had them shipped to the United States. *Id.* at 3, ¶ 8(a); 5, ¶ 8(b); 7, ¶ 8. After the imported engines arrived in the United States, Powertrain sold or distributed the

---

[2] Apparently, there have been no payments or collections relative to the judgment.

[3] In the midst of the proceedings in the instant case, Ma filed counterclaims against Powertrain and third-party claims against William H. Shawn and ShawnCoulson, LLP, lawyers she claimed had represented her in an earlier case. The Court dismissed the counterclaims and third-party claims prior to trial, as detailed below.

In Ma's third-party claims against William H. Shawn and ShawnCoulson, LLP (the "Third-Party Defendants"), Ma asserted that the instant case was "spawned from" a previous case styled *Powertrain, Inc., et al., v. American Honda Motor Co., et al.*, No. 1:03-cv-668, 2007 WL 2254346 (N.D. Miss. Aug. 2, 2007) (the "*Honda* case"), which concerned whether Powertrain and others had illegally copied American Honda Motor Co.'s trade dress; that the Third-Party Defendants had represented both Ma and Powertrain in the *Honda* case; and that "as a proximate result" of this alleged representation, "[Powertrain was] able to bring this case against [Ma]" in breach of an agreement between Powertrain and Ma that Powertrain would do no harm to her. Ma maintained that in the event she was found liable in the instant case she should be entitled to recover from the Third-Party Defendants. She asserted eight causes of action against the Third-Party Defendants: breach of contract, conflict of interests, breach of fiduciary duty, fraud, negligent misrepresentation, constructive fraud, negligence, and legal malpractice. The Third-Party Defendants filed a motion to dismiss the third-party claims. This Court subsequently granted the motion and dismissed the third-party claims as failing to meet the standard of Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Ma's counterclaims against Powertrain were based on the same set of facts as her third-party claims and included nearly identical claims for breach of contract, breach of fiduciary duty, fraud, negligent misrepresentation, and constructive fraud. The backbone of her counterclaims was that Powertrain had offered to represent her and "do no harm to her" in the *Honda* case and that Powertrain had violated this "do-no-harm agreement" by filing the instant case against Ma. Powertrain filed a motion for summary judgment, arguing that Ma's counterclaims were barred by both the statute of limitations and the statute of frauds. The Court granted Powertrain's motion for summary judgment, finding that no genuine dispute of fact existed concerning the timeliness of Ma's counterclaims and that the counterclaims were barred by the statute of frauds—in part because the alleged agreement could not have been performed within the space of fifteen months as required by the statute.

engines. *Id.* at 7, ¶ 9. All subject engines were manufactured in China, were imported for resale in the United States by Powertrain, and were subject to EPA emission standards. *Id.* at 6, ¶¶ 6, 7. Although the extent of Ma's involvement is contested, it is undisputed that Ma helped find Chinese manufacturers who could supply the products Powertrain wanted. *Id.* at 3, ¶ 8(a); 5, ¶ 8(b).

Between sometime in 2002 and early 2003, Best Machinery assisted Powertrain in Powertrain's purchase of a handful of engines, as well as related equipment, manufactured in China by EVERFINE Corporation ("Everfine"). *Id.* at 6, ¶ 9(a)(1). As a part of the process of purchasing engines manufactured by Everfine, Powertrain applied for and eventually obtained a Class I Certificate of Conformity from the EPA which was issued to Powertrain on June 4, 2002, for a 4 hp/163 cc Everfine engine designated as engine family 2PTIS.1632P1 for model year 2002. *Id.* at 6, ¶ 9(a)(2). In early 2003, Best Machinery ceased its relationship with Everfine and began to arrange for Powertrain to purchase engines and related equipment manufactured by Tong Yong,[4] another Chinese manufacturer. *Id.* at 6, ¶ 9(a)(4). From 2003 to 2006, Powertrain renewed its Certificate of Conformity for the Everfine 4 hp/163 cc engine under the carry-over provisions of 40 C.F.R. § 90.119. *Id.* Powertrain obtained that Class I Certificate of Conformity with the assistance of Thomas Keenum, an attorney whom Powertrain retained for that purpose. *Id.* at 6, ¶ 9(a)(3).

Between 2002 and 2006, Powertrain purchased 78,284 small engines and non-road equipment containing such engines from China through Best Machinery for resale in the United States. *Id.* at 6, ¶ 9(a)(5). Between early 2003 and approximately November of 2006, the

---

[4] Tong Yong is variously referred to throughout the Pretrial Order [272] and trial exhibits as "Tong Yong" or "Tongyong." Throughout this opinion, the Court will refer to the company as "Tong Yong."

3

engines and related equipment purchased by Powertrain through Best Machinery were manufactured by Tong Yong. *Id.* at 6, ¶ (9)(a)(4).

On May 28, 2009, the United States Department of Justice, Environmental and Natural Resource Division, filed a complaint against Powertrain and its sister companies, Wood Sales, Inc. ("Wood Sales") and Tool Mart, Inc. ("Tool Mart"), related to the purchase and importation of the subject engines into the United States. *Id.* at 7, ¶ 9(a)(10). In May of 2011, the United States and Powertrain, Wood Sales, and Tool Mart entered into a Consent Decree requiring Powertrain, Wood Sales, and Tool Mart to pay civil penalties to the United States in the amount of $2,000,000 plus interest; to implement an emission reduction program; and to destroy or export any remaining subject engines in their inventory. *Id.* at 7, ¶ 9(a)(11). Powertrain subsequently initiated this suit claiming that Best Machinery and Ma should be held responsible for the damages Powertrain incurred in the suit by the United States against Powertrain. *Id.* at 7, ¶ 9(a)(12).

Alleged Facts

Powertrain alleged that Ma, both individually and as the alter ego of Best Machinery, imported to the United States from China small engines that violated the EPA's emission and labeling standards and were not covered by certificates of conformity, and that Powertrain purchased 78,284 of the engines (the "subject engines") from Ma. Powertrain alleged that as a direct and proximate result of Ma's alleged sale of the subject engines to Powertrain, the United States filed civil actions against Powertrain for injunctive relief and the assessment of civil penalties for these violations, and Powertrain was liable for civil penalties in the amount of $2,000,000 plus interest, the cost of exporting or permanently destroying the subject engines, and the cost of implementing an emission off-set project. Powertrain asserted causes of action for

4

negligence, breach of contract, breach of warranty, and piercing-the-corporate-veil/alter-ego liability for Ma's involvement through Best Machinery.

On October 28, 2014, trial commenced. At the close of Powertrain's case-in-chief, on October 29, 2014, Ma moved for judgment as a matter of law. The Court granted the motion and entered final judgment [277] in favor of Ma against Powertrain.

On November 21, 2014, Powertrain filed the present motion for a new trial [279]. Powertrain asserts essentially two grounds for relief: (1) "the trial court erred in refusing to allow Powertrain to read into the record deposition testimony of Best [Machinery]'s owners, Zhao Lei and Zhao Agen"; and (2) "the trial court's decision [to grant Ma's motion for judgment as a matter of law at the close of Powertrain's case-in-chief] is against the great weight of the evidence when viewed in the light most favorable to Powertrain" and was the result of improper weighing of the evidence and credibility determinations. *See* Pl.'s Mot. New Trial [279] ¶ 9.

The Court has carefully considered the arguments concerning Powertrain's request for a new trial, as well as attached documentation, the trial transcript, the trial exhibits, and all authorities bearing on the matter. The Court is of the opinion that none of Powertrain's arguments have merit and that the Court's judgment should stand, for the reasons stated below.

### B. *Federal Rule of Civil Procedure 59 Standard*

Rule 59 of the Federal Rules of Civil Procedure provides in pertinent part that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A). Such a motion "must be filed no later than 28 days after the entry of judgment." Fed. R. Civ. P. 59(b). Because the instant motion for a new trial was filed within 28 days of the entry of judgment, it shall be construed as a Rule 59 motion.

5

*See, e.g., Komolafe v. Dewease*, 87 F. App'x 385, 2004 WL 304198, at *1 (5th Cir. 2004) (per curiam) (citing *Teal v. Eagle Fleet, Inc.*, 933 F.2d 341, 347 n.3 (5th Cir. 1991) (post-judgment motion for new trial and/or for relief from judgment was properly considered under Rule 59 because it was filed within the requisite Rule 59 time period)).

"A district court has discretion to grant a new trial under Rule 59(a) of the Federal Rules of Civil Procedure when it is necessary to do so 'to prevent an injustice.' " *Jones v. Ruiz*, 478 F. App'x 834, 835 (5th Cir. 2012) (per curiam) (quoting *United States v. Flores*, 981 F.2d 231, 237 (5th Cir. 1993)). Although Rule 59(a) does not state appropriate grounds for a new trial, "[a] new trial may be appropriate if the verdict is against the weight of the evidence, the amount awarded is excessive, or the trial was unfair or marred by prejudicial error." *Scott v. Monsanto Co.*, 868 F.2d 786, 789 (5th Cir. 1989) (internal citation omitted). "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999).

### C. Analysis and Discussion

As stated above, Powertrain makes two arguments in support of its request for a new trial under Rule 59. The Court will analyze each argument in turn.

### i. Whether the Court Improperly Excluded Deposition Testimony of Zhao Lei and Zhao Agen

Prior to the commencement of trial in this cause, Ma moved *in limine* to exclude the introduction of depositions of Zhao Lei and Zhao Agen which were taken during the earlier *Honda* case. The Court granted Ma's motion *in limine* and excluded the deposition testimony, finding that the depositions did not involve the same subject matter between the same parties as required by Rule 32(a)(8) of the Federal Rules of Civil Procedure. However, the Court did not

foreclose the possibility that Powertrain might use the deposition testimony for impeachment purposes. Trial Tr. vol. 1, at 2, Oct. 28, 2014. Powertrain argues in its post-trial motion that the Court improperly excluded the deposition testimony, and in so doing, "prevent[ed] Powertrain from presenting crucial testimony related to its 'piercing the corporate veil' theory." Pl.'s Mem. Br. Supp. Mot. New Trial [280] at 1. Powertrain further argues that the testimony should have been admitted because it was taken "in [prior] litigation . . . involving the same issues herein (engines sold to Powertrain)"; because the deponents were unavailable to testify at the trial; because the deponents were owners of Best Machinery and their depositions could have been used for any purpose under Rule 32; and because the deposition transcripts were provided to Ma on December 6, 2013, allowing Ma "every opportunity to depose Zhao Lei and Zhao Agen on matters not covered in the depositions which have been identified and submitted by Plaintiff." *Id.* at 1–11.

The Court notes that the Federal Rules of Evidence generally exclude testimony from a prior proceeding as hearsay. *See* Fed. R. Evid. 802. In addition, under Rule 611 of the Federal Rules of Evidence the Court has discretion to control the "manner in which deposition testimony is presented." *Oostendorp v. Khanna*, 937 F.2d 1177, 1179 (7th Cir. 1991), *cert. denied*, 502 U.S. 1064, 112 S. Ct. 951, 117 L. Ed. 2d 119 (1992). Although Rule 32 of the Federal Rules of Civil Procedure permits deposition testimony from a prior proceeding to be introduced into a later proceeding in limited circumstances with the Court's discretion, the Fifth Circuit has stated clearly that "[a] deposition may not be introduced into the record at a trial or hearing for any purpose unless the witness is unavailable or exceptional circumstances justify its admission." *See Jauch v. Corley*, 830 F.2d 47, 49–50 (5th Cir. 1987); *accord Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 554 (5th Cir. 2000). The party attempting to introduce the

deposition testimony is required to make "a showing, before the deposition is admissible that the witness giving the deposition is unavailable or that exceptional circumstances justify admission of the deposition." *Jauch*, 830 F.2d at 49.

Rule 32 provides in pertinent part:

> At a . . . trial, all or part of a deposition may be used against a party on these conditions:
>
> (A) the party was present or represented at the taking of the deposition or had reasonable notice of it;
>
> (B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and
>
> (C) the use is allowed by Rule 32(a)(2) through (8).

Fed. R. Civ. P. 32(a)(1). Powertrain argues the deposition testimony of Zhao Lei and Zhao Agen was admissible pursuant to Rule 32(a)(8), (3), and (4).[5] The Court will examine each pertinent provision in turn.

### a. Federal Rule of Civil Procedure 32(a)(8)

Rule 32(a)(8) allows the use of deposition testimony "lawfully taken . . . in any federal- or state-court action" to "be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action" and "as allowed by the Federal Rules of Evidence." Fed. R. Civ. P. 32(a)(8). Ma contended in her motion *in limine* that the deposition testimony should be excluded because "the deposition[s] w[ere] taken for another case, . . . defended by attorneys with different

---

[5] The Court notes that Rule 32(a)(2) allows the use of deposition testimony "to contradict or impeach the testimony given by the deponent as a witness, or for any other purpose allowed by the Federal Rules of Evidence." Fed. R. Civ. P. 32(a)(2). After the Court granted Ma's motion *in limine* to exclude the deposition testimony, the Court made reference to this Rule, stating" "[I]t may be that it would develop that some specific statements [from the depositions] might be relevant for impeachment purposes, and we'll cross that bridge when we get to it." Trial Tr. vol. 1, at 2, Oct. 28, 2014.

objectives," and "would deprive Ma's right to cross-examine said witnesses." *See* Def.'s Mem. Br. Supp. Mot. *Limine* [242] at 1. Ma maintained that both depositions were taken by John R. Chiles, an attorney who represented American Honda Motor Co., and were defended by the late attorney Richard F. Cauley. Ma further maintained that "[t]he *Honda* case was a trademark suit," while "[t]he instant case is about sales contracts and the do-no-harm contracts." *Id.* at 2. Ma contended that "[i]f Powertrain wishe[d] to have [Zhao Lei and Zhao Agen] testify by deposition, it could have conducted a deposition for this case, when Ma would be allowed to cross-examine the witnesses." *Id.* at 3.

In response, Powertrain maintained that Powertrain, Ma, and Best Machinery were defendants in the *Honda* case and that the depositions taken in that case of Zhao Lei and Zhao Agen "[were] material and relevant in this cause to establish [Ma]'s conduct and activity with [Best Machinery] and her relationship with Zhao Lei and Zhao Agen." Pl.'s Mem. Br. Supp. Resp. Opp'n to Def.'s Mot. *Limine* [249] at 1. Powertrain further maintained that "[t]he exhibits to the deposition of Zhao Lei reflect the disregard of corporate formalities and the transfer of [Best Machinery] funds to Zhao Lei's new corporation, Champion Power Equipment, Inc." *Id.* at 1–2. Powertrain asserted that "[i]n the case at bar, Ma had every opportunity to depose Zhao Lei and Zhao Agen on matters not covered in the depositions which have been identified and submitted by Plaintiffs." *Id.* at 2.

In the opinion of the Court, the depositions of Zhao Lei and Zhao Agen were not admissible under Rule 32(a)(8), because the depositions involved neither the "same parties" nor the "same issues" for purposes of the Rule.

First, the *Honda* case did not involve the "same parties" as the case *sub judice* for the purposes of Rule 32(a)(8). Powertrain filed that suit in anticipation of a future lawsuit by

American Honda Motor Co. ("Honda") against Powertrain for allegedly infringing on Honda's trademark. Honda filed a countersuit against Best Machinery, Ma, and others, alleging that those persons had infringed upon its trademark. Thus, Ma was sued by Honda—not Powertrain—in the *Honda* case. Ma and Best Machinery subsequently filed a counterclaim against Honda alleging, *inter alia*, that "counterdefendant Honda has engaged in a systematic campaign of threatening distributors and customers of Powertrain" by "falsely and misleadingly, in print and through sales representatives, claim[ing] and continu[ing] to claim Powertrain's black and yellow small engines sold under the Power[t]rain trademark infringe upon or otherwise copy the Honda defendant's red and white small engines." *See* Ma's & Best Machinery's Countercl., *Honda* case, Pl.'s Trial Ex. 2, at 3;[6] [280-6] at 3.[7] While the *Honda* case was pending, Honda's counsel took the subject depositions of Zhao Lei and Zhao Agen. The language of the counterclaim indicates that Powertrain, Ma, and Best Machinery had aligned interests in that proceeding. In the case *sub judice*, Powertrain and Ma obviously had opposing interests. Accordingly, the Court finds that Powertrain failed to satisfy the "same parties" provision of Rule 32(a)(8).

Second, the *Honda* case did not "involve the same subject matter" for the purposes of Rule 32(a)(8). The *Honda* case presented trademark infringement issues.[8] Conversely, the case

---

[6] Defendant's Trial Exhibit 2 has no corresponding Bates labels.

[7] United States District Court Judge Michael P. Mills subsequently entered an Order granting Ma's and Best Machinery's motion to voluntarily dismiss all counterclaims filed against Honda. *See* Order, *Honda* case, Def.'s Trial Ex. 1, at 1–6. (Defendant's Trial Exhibit 1 has no corresponding Bates labels.)

[8] The *Honda* case was set for trial in two phases: the first phase to determine whether Honda had a protectable trade dress interest with respect to its GX series engines and, if so, whether such trade dress interest had been infringed; in the event that infringement was found, the second phase to determine appropriate recovery against the infringing parties. The jury verdict in the first phase of the trial was that Honda had a protectable trade dress interest with respect to its GX series engines, that Best Machinery had infringed on Honda's trade dress interests, and that Ma had contributorily infringed upon Honda's trade dress interests. Judge Mills entered a permanent injunction and amended permanent injunction, allowing Powertrain to present an engine design for the Court to determine whether the proposed engine design violated the terms of the injunction. Powertrain presented the

*sub judice* presents claims stemming from Ma's alleged involvement with Best Machinery and Powertrain in the import and sale of certain engines that allegedly violated EPA standards and allegedly caused Powertrain to incur civil penalties and other damages. Although Powertrain claims that the engines referred to in the *Honda* case and the engines referred to in the instant case are one and the same, in the opinion of this Court, that is insufficient to establish that the *Honda* case and this case "involve[d] the same subject matter between the same parties." *See* Fed. R. Civ. P. 32(a)(8).

These considerations aside, the Court also had other concerns about the admissibility of the deposition testimony under Rule 32(a)(8). Of ultimate importance to a district court faced with such an admissibility question is whether the other party will have a fair opportunity to address or challenge the deposition testimony at the trial. In the case *sub judice*, particularly disturbing to this Court was the fact that Powertrain and Ma were aligned with the same interests in the *Honda* case wherein the subject depositions were taken. That alone highlights the conflicting issues present in the *Honda* case and this case. It cannot be said that Ma's involvement in the depositions in the *Honda* case "was calculated to induce as thorough a cross-examination as the interest of [Ma]" as the instant case would require, given that the instant case involves claims to hold Ma individually liable based on her involvement with Best Machinery. *See Rule v. Int'l Ass'n of Bridge, et al., Workers*, 568 F.2d 558, 569 (8th Cir. 1977). Clearly, Ma had no opportunity at all to cross-examine or otherwise structure the content of the inquiry of either deponent. For all of the foregoing reasons, the Court finds that the deposition testimony of Zhao Lei and Zhao Agen was not admissible under Rule 32(a)(8).

---

proposed engine design to the Court, and Judge Mills ruled that the engine design did not violate the terms of the injunction. Judge Mills also entered a $13 million judgment against Best Machinery. *See generally Powertrain, Inc. v. Am. Honda Motor Co.*, No. 1:03-cv-668.

### b. **Federal Rule of Civil Procedure 32(a)(3)–(4)**

Powertrain never raised an argument that the deposition testimony should have been allowed in pursuant to Rule 32(a)(3) or Rule 32(a)(4) until it filed the present post-trial motion. Accordingly, any such arguments are waived. *See Henry's Marine Serv., Inc. v. Fireman's Fund Ins. Co.*, 193 F. App'x 267, 277 (5th Cir. 2006) (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) ("These [Rule 59] motions cannot be used to raise arguments which could, and should, have been made before the judgment issued. Moreover, they cannot be used to argue a case under a new legal theory.")). Additionally, it is the opinion of the Court that because the depositions were taken in an earlier action, the *Honda* case, and not the case *sub judice*, the depositions could only be admitted if the Court found that the *Honda* case and this case "involve[d] the same subject matter between the same parties" under Rule 32(a)(8). Regardless, a brief examination of Rules 32(a)(3)–(4) affirms the Court's decision that the depositions were properly excluded at trial.

Rule 32(a)(3) permits a deposition to be used "for any purpose" if the Court finds the deponent "was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)." Fed. R. Civ. P. 32(a)(3). Best Machinery was dismissed on default judgment earlier in this proceeding and thus was not a party to this action at the time of trial. Further, neither Zhao Lei nor Zhao Agen has been designated under Rule 30(b)(6) to testify on behalf of Best Machinery in this case. Accordingly, Powertrain failed to demonstrate the deposition testimony was admissible under Rule 32(a)(3).

Rule 32(a)(4) permits a deposition to be used "for any purpose" if the Court finds the witness is "unavailable" to attend or testify at trial. Fed. R. Civ. P. 32(a)(4).[9] In its post-trial motion, Powertrain claims the two witnesses were unavailable to testify at trial in this matter. Powertrain never explicitly made this argument in its response to Ma's motion *in limine* or at trial, although Powertrain did state that in its response to the motion *in limine* that "Zhao Lei is an adult resident citizen of California and resides with [Ma] and is capable of attending court for Ma and refuting any items contained in his deposition" and that "Plaintiffs have no idea where Zhao Agen is at this time, but when deposed he was a resident of California." Pl.'s Mem. Br. Supp. Resp. Opp'n to Def.'s Mot. *Limine* [249] at 2.

"[A] deposition is an acceptable substitute for oral testimony when in-court observation of the witness is extremely difficult or virtually impossible." *Jauch*, 830 F.2d at 50. "The burden of showing the witness's unavailability under Rule 32(a)(3) rests with the party seeking to introduce the deposition, in this case[, Powertrain]." *See id.*; *accord Moore v. Miss. Valley State Univ.*, 871 F.2d 545, 552 (5th Cir. 1989). "The trial court cannot act spontaneously in these circumstances. Rather, it must be given a reason that conforms to Rule[] 804(a)(5) [of the

---

[9] An "unavailable witness" as defined by the Rule is predicated upon a finding by the Court:

    (A)    that the witness is dead;

    (B)    that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition;

    (C)    that the witness cannot attend or testify because of age, illness, infirmity, or imprisonment;

    (D)    that the party offering the deposition could not procure the witness's attendance by subpoena; or

    (E)    on motion and notice, that exceptional circumstances make it desirable—in the interest of justice and with due regard to the importance of live testimony in open court—to permit the deposition to be used.

*See* Fed. R. Civ. P. 32(a)(4).

13

Federal Rules of Evidence] and [Rule] 32(a)[(4) of the Federal Rules of Civil Procedure] to allow in the deposition." *Moore*, 871 F.2d at 552. Powertrain failed to demonstrate the unavailability of Zhao Agen and Zhao Lei to the satisfaction of Rule 32(a)(4). Thus, Powertrain's argument that the depositions could be used for any purpose at trial is unavailing.

### c. **Other Considerations**

Even assuming *arguendo* that the deposition testimony of Zhao Lei and Zhao Agen could have been properly admitted into evidence at trial, the testimony would not have affected the Court's decision.

Powertrain contends that "[t]he depositions of Zhao Lei and Zhao Agen are material and relevant in this cause to establish Ma's conduct and activity with Best [Machinery] and her relationship with Zhao Lei and Zhao Agen" and further states that "[w]ithout question this information is necessary given that this Honorable Court ruled Zhao Lei and Zhao Agen were the owners of Best [Machinery]." Pl.'s Mem. Br. Supp. Mot. New Trial [280] at 9. Powertrain maintains that the excluded testimony would have shown, *inter alia*, that "Zhao Lei lives with Ma and has been commonly referred to as Ma's husband" and that "Best [Machinery] disregarded corporate formalities and . . . was undercapitalized—Zhao Lei funneled over $1 million dollars out of Best [Machinery] to Zhao Lei's new corporation, Champion Power Equipment, Inc." *Id.* Powertrain further maintains that Zhao Agen testified in his deposition that he gave full authority to Ma, that testimony from both demonstrated that there were no directors of Best Machinery, that no records were kept at Best Machinery's alleged corporate office, that

there were no corporate meetings, no meetings of shareholders, and that Zhao Agen had no idea who was the president of Best Machinery.

However, Powertrain also states that Ma's testimony on the witness stand showed that "she lived with Zhao Lei and he was the father of her daughter"; that although "she did not initially remember when Best [Machinery] went out of business, . . . Zhao Lei sold Best [Machinery] to his father, Zhao Agen, for $2,000.00 in 2002"; that "although Zhao Lei sold Best [Machinery] to Zhao Agen, he was responsible for transferring $1.2 million dollars to Champion [Power Equipment, Inc. ("Champion Power Equipment")]—a new company owned by Zhao Lei"; and that Ma had no interest in Champion Power Equipment, yet signed a guaranty for Champion Power Equipment for $1,000,000.00. *Id.* at 3–4.[10] Thus, Ma's own testimony provided support for Powertrain's case on the same points. The excluded testimony would not have provided necessary proof for certain elements of Powertrain's case which were deficient, as explained below.

### ii. Whether the Court Improperly Granted Ma's Motion for Judgment as a Matter of Law at the Close of Powertrain's Case-in-Chief

Next, Powertrain argues that a new trial is proper because the Court erred in granting Ma's motion for judgment as a matter of law at the close of Powertrain's case-in-chief. Powertrain maintains that the Court failed to review the evidence in the light most favorable to Powertrain in ruling that Powertrain failed to carry its burden to pierce the corporate veil. Powertrain further maintains that the Court improperly weighed evidence and made credibility determinations in Ma's favor.

The United States Supreme Court has stated:

---

[10] Powertrain further states that Ma's personal banking records from 2005 show that Ma was married and infers that this means she was married to Lei Zhao. However, these records were not admitted into evidence at trial and thus cannot be considered.

[Rule] 50 sets forth the procedural requirements for challenging the sufficiency of the evidence in a civil jury trial and establishes two stages for such challenges—prior to submission of the case to the jury, and after the verdict and entry of judgment. Rule 50(a) allows a party to challenge the sufficiency of the evidence prior to submission of the case to the jury, and authorizes the district court to grant such motions at the court's discretion[.]

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 399, 126 S. Ct. 980, 163 L. Ed. 2d 974 (2006). Rule 50(a) of the Federal Rules of Civil Procedure provides:

(a)   Judgment as a Matter of Law.

(1) <u>In General.</u> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

(2) <u>Motion.</u> A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

Fed. R. Civ. P. 50(a).

On a Rule 50(a) motion, "[t]he court may render judgment where a party has been heard and there is no legally sufficient evidentiary basis for a reasonable factfinder to find for the party on that issue." *Bass v. City of Jackson, Miss.*, 540 F. App'x 300, 301 (5th Cir. 2013) (per curiam) (citing *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 337 (5th Cir. 2001)). "[T]he trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–

51, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citations omitted). The United States Supreme

Court has further explained:

> "Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a scintilla of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

*Id.* at 251, 106 S. Ct. 2505 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448, 20 L. Ed.

867 (1872) (other internal citations omitted)).

"[D]irected verdict motions are . . . decided on the evidence that has been admitted." *Id.*,

106 S. Ct. 2505 (internal quotation marks and citation omitted). "Inadmissible evidence

contributes nothing to a legally sufficient evidentiary basis." *Weisgram v. Marley Co.*, 528 U.S.

440, 454, 120 S. Ct. 1011, 145 L. Ed. 2d 958 (2000) (internal quotation marks and citation

omitted). "In evaluating [a Rule 50(a) motion], the court must consider all of the evidence in the

light most favorable to the nonmovant, drawing all factual inferences in favor of the non-moving

party, and leaving credibility determinations, the weighing of evidence, and the drawing of

legitimate inferences from the facts to the jury." *Gonzalez v. Fresenius Med. Care N. Am.*, 689

F.3d 470, 474–45 (5th Cir. 2012) (internal citation omitted). "[T]he inquiry" is "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.

Ct. 2505. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find

by a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.' " *Id.* at 252, 106 S. Ct. 2505 (quoting *Munson*, 14 Wall. at 448).

"[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* at 255, 106 S. Ct. 2505. Judgment as a matter of law is proper "if the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not have arrived at a contrary verdict." *Homoki v. Conversion Serv., Inc.*, 717 F.3d 388, 395 (5th Cir. 2013).

In the case *sub judice*, the Court held that Powertrain failed to offer proof sufficient to create a jury issue on its pierce-the-corporate-veil theory, and in so doing, failed to lay a necessary foundation for its other claims: negligence, breach of contract, and breach of warranty. In the Court's opinion, the ruling that Plaintiff failed to present proof on its prima facie case necessarily preceded the credibility-assessment stage of the trial, as it was a determination based on the law itself. Because a reasonable jury would not have had a legally sufficient evidentiary basis to find for Powertrain under Mississippi law, judgment as a matter of law was proper. If the case had been given to the jury, only one verdict would have been possible, given the deficiency of Powertrain's pierce-the-veil theory.

### The Necessary Foundation: Powertrain's Pierce-the-Corporate-Veil Theory

"Corporate veil claims are analyzed under state law," in this case, Mississippi law. *See Penn Nat'l Gaming v. Ratliff*, 954 So. 2d 427, 431 (Miss. 2007) (citing *United States v. Bestfoods*, 524 U.S. 51, 61–63, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998)); *see also GM*

18

*Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992) ("In this diversity case, as an *Erie* court we apply the substantive law of Mississippi.").

The cardinal rule of corporate law is that a corporation possesses a legal existence separate and apart from that of its officers and shareholders[;] . . . this rule applies whether such shareholders are individuals or corporations." *Canadian Nat'l Ry. Co. v. Waltman*, 94 So. 3d 1111, 1115 (Miss. 2012) (quoting *Buchanan v. Ameristar Casino Vicksburg, Inc.*, 957 So. 2d 969, 977 (Miss. 2007) (quotation marks omitted)). "Piercing the corporate veil is '[t]he judicial act of imposing personal liability on otherwise immune corporate officers, directors, and shareholders for the corporation's wrongful acts.' " *Tanfield Eng'g Sys., Inc. v. Thornton*, 97 So. 3d 694, 698 n.9 (Miss. 2012) (quoting *Black's Law Dictionary* 1184 (8th ed. 2007)). "Mississippi case law generally favors maintaining corporate entities and avoiding attempts to pierce the corporate veil." *Canadian Nat'l Ry. Co.*, 94 So. 3d at 1115 (quoting *Buchanan*, 957 So. 2d at 977).[11] A pierce-the-corporate-veil theory brought under Mississippi law "generally applies to two broad categories of cases: (1) [t]hose in which a third party seeks to hold shareholders individually liable for corporate debts; and (2) [t]hose in which a shareholder utilizes a corporation to perform indirectly acts which the shareholder could not legally perform

---

[11] *See Penn Nat'l Gaming, Inc. v. Ratliff*, 954 So. 2d 427, 431 (Miss. 2007) ("We decline to pierce the corporate veil except in those extraordinary factual circumstances where to do otherwise would subvert the ends of justice."); *Rosson v. McFarland*, 962 So. 2d 1279, 1284 (Miss. 2007) ("As early as 1933, th[e Mississippi Supreme] Court stated [a] corporation is [an] entity separate and distinct from its stockholders. As do most courts, this Court has reserved piercing the corporate veil for factual circumstances which are clearly extraordinary, and the distinct corporate identity will be maintained unless to do so would subvert the ends of justice."); *Nash Plumbing, Inc. v. Shasco Wholesale Supply, Inc.*, 875 So. 2d 1077, 1082 (Miss. 2004) ("Courts do not take piercing of the corporate veil lightly because of the chilling effect it has on corporate risk-taking."); *Gray v. Edgewater Landing, Inc.*, 541 So. 2d 1044, 1046 (Miss. 1989) ("Among this Court's reports may be found a long string of decisions reflecting our law's commitment to the legal integrity of the corporate entity—and the concomitant limited liability of shareholders.") (citing cases); *Johnson & Higgins of Miss., Inc. v. Comm'r of Ins. of Miss.*, 321 So. 2d 281, 284 (Miss. 1975) ("The general rule of law basic to the concept of the corporation is that the distinct corporate identity will be maintained unless to do so would subvert the ends of justice.").

19

as an individual." *Retzer v. Retzer*, 578 So. 2d 580, 607 (Miss. 1990) (internal quotation marks and citation omitted).

In this case, Powertrain alleged that Ma should be held liable as an alter ego of Best Machinery. *See* Pl.'s Mem. Br. Supp. Mot. New Trial [280] at 13. "Alter ego is defined as: 'A corporation used by an individual in conducting personal business, the result being that a court may impose liability on the individual by piercing the corporate veil when fraud has been perpetrated on someone dealing with the corporation.' " *Tanfield Eng'g Sys., Inc.*, 97 So. 3d at 698 n.8 (quoting *Black's Law Dictionary* 86). The Mississippi Supreme Court recently explained: " '[A]lter ego' is not a substantive claim but merely a procedural argument that, if successful, allows a plaintiff to pierce the corporate veil and recover from a corporation's shareholders." *EDW Invs., LLC v. Barnett*, 149 So. 3d 489, 492 (Miss. 2014) (citing *Gray v. Edgewater Landing, Inc.*, 541 So. 2d 1044, 1047 (Miss. 1989)). Importantly, "[a]lter-ego liability can be extended only to a corporation's shareholders . . . ." *Id.* (citing *Gray*, 541 So. 2d at 1047).

Powertrain introduced evidence that Ma referred to Best Machinery as "my new office and company," *see, e.g.*, 3/19/2002 Email from Ma to Jeffery Wood, Pl.'s Trial Ex. 10, at 1 (Bates #00008575); and that Ma was a personal guarantor for Champion Power Equipment, *see* Commercial Guar., Pl.'s Trial Ex. 14A, at 1–2 (Bates #17354–#17355); [280-7] at 1–4. Additionally, Ma testified at trial that she lived with Zhao Lei, who owned Best Machinery for a few months in 2002 before selling the company to his father, Zhao Agen. *See* Joyce Ma Test., Trial Tr. vol. 2, at 2–3, Oct. 29, 2014.

However, Jeffery Wood, vice president of Powertrain, testified that "[Powertrain's] understanding from [Ma] was that she was an employee of Best Machinery." Jeffery Wood

Test., Trial Tr. vol. 1, at 116, Oct. 28, 2014; *see* Joyce Ma Test., Trial Tr. vol. 2, at 8, Oct. 29, 2014 ("I would be the employee always of [Best Machinery]."). *See also* Pl.'s Mem. Br. Supp. Mot. New Trial [280] at 9–10 ("Best [Machinery], Champion [Power Equipment], and JL Industrial shared employees, primarily Ma, who worked for all three[.]"). Additionally, Ma's W-2 statements, which were admitted as a trial exhibit, show the withholding of Social Security and other requirements of a regular employee. *See* Ma's W-2 Statements, Def.'s Trial Ex. 5. Jeffery Wood further testified that he was "[n]ot . . . aware of" any documentation wherein Ma signed as president, owner, or otherwise of Best Machinery, and that he was "[n]ot . . . aware of" any corporate records that listed Ma as a shareholder, director, or owner of Best Machinery. Jeffery Wood Test., Trial Tr. vol. 1, at 119, 133–35, Oct. 28, 2014. Although Powertrain introduced evidence at trial that Ma was the sole employee of Best Machinery and was heavily involved in its day-to-day operations, "general assumption of sales duties and business operation duties for the corporation cannot be held a basis of liability for one agent or shareholder." *See Hardy v. Brock*, 826 So. 2d 71, 75 (Miss. 2002) (citing *Gray*, 541 So. 2d at 1047). In sum, "[i]n this case, there is no proof that [Ma] acted in any capacity other than as that of officer, agent, or employee of the corporation . . . ." *See Rosson v. McFarland*, 962 So. 2d 1279, 1289 (Miss. 2007). Accordingly, Powertrain could not pursue a judgment against Ma via an alter-ego theory, the very foundation of its prima facie case was not established, and judgment as a matter of law was proper.[12, 13]

---

[12] As stated above, Powertrain argues that the excluded deposition testimony of Zhao Lei and Zhao Agen would have substantiated its pierce-the-corporate-veil case. However, that testimony does not support that Ma was a shareholder or owner of Best Machinery.

[13] Furthermore, the Mississippi Supreme Court has stated: "[I]n accordance with the corporate shield and alter[-]ego liability, in order for there to be alter[-]ego liability placed on one shareholder of a corporation, there must be a claim in existence against the corporation. A claim against the corporation is a prerequisite for alter[-]ego liability being placed on one shareholder." *See Hardy v. Brock*, 826 So. 2d 71, 75–76 (Miss. 2002) (citing 1 William Meade Fletcher, *Fletchers Cyclopedia of the Law of Private Corporations* § 41.28, at 608 (1999)). Trial

However, even assuming *arguendo* that Powertrain had produced evidence that Ma was a principal shareholder, director, or owner of Best Machinery, that alone would not have supported piercing the corporate veil; nor would evidence that a sole owner used and controlled a corporation to promote his or her ends; nor would evidence that a principal shareholder oversaw the day-to-day operation of the corporation. *See id.* at 1286. Indeed, if Powertrain had introduced evidence that Ma was a director, principal shareholder, or owner of Best Machinery, Powertrain still would have had to present proof on each element of its theory for the case to be given to the jury. *See Rest. of Hattiesburg, LLC v. Hotel & Rest. Supply, Inc.*, 84 So. 3d 32, 39–40 (Miss. Ct. App. 2012) (citing *Gray*, 541 So. 2d at 1047) ("A successful veil-piercing claim must show each of the three *Gray* prongs.")).

Under Mississippi law, the Court will not disregard the corporate entity unless the plaintiff presents proof on three elements, as laid out in *Gray v. Edgewater Landing, Inc.*: " '(a) some frustration of contractual expectations regarding the party to whom he looked for performance; (b) the flagrant disregard of corporate formalities by the defendant corporation and its principals; and (c) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder.' " *See GM Acceptance Corp.*, 954 F.2d at 1085 (quoting *Gray*, 541 So. 2d at 1047); *see also Canadian Nat'l Ry. Co.*, 94 So. 3d at 1115 (clarifying the standard is the same whether tort or contract case).[14] " '[A] party must present some credible evidence on each

___

commenced in the case *sub judice* in the wake of this Court's granting of default judgment to Powertrain against Best Machinery. Thus, the alter-ego theory against Ma likely fails for the additional reason that there was no claim in existence against the corporation, Best Machinery, at the time of trial. Nor had Powertrain sought leave to add Champion Power Equipment or Tong Yong as a defendant in the case so that it might advance a pierce-the-corporate-veil theory against Ma with respect to either of those two companies.

[14] Mississippi federal district courts have often utilized a ten-factor test when applying Mississippi law for alter-ego theories concerning a parent corporation and its subsidiary. *See, e.g., Gammill v. Lincoln Life & Annuity Distribs., Inc.*, 200 F. Supp. 2d 632, 635 (S.D. Miss. 2001). However, the Mississippi Supreme Court has declined to adopt the ten-factor test. *See Buchanan v. Ameristar Casino Vicksburg, Inc.*, 957 So. 2d 969, 977 (Miss. 2007) ("While these ten factors are instructive on the alter[-]ego theory, [Mississippi state courts have] not adopted the

22

of these points' before the issue of whether to pierce the corporate veil may go to the jury." *GM Acceptance Corp.*, 954 F.2d at 1085 (quoting *Gray*, 541 So. 2d at 1047).

### (a) Some Frustration of Contractual Expectations Regarding the Party to Whom Powertrain Looked for Performance

The Mississippi Supreme Court has explained that the first *Gray* factor, "some frustration of contractual expectations regarding the party to whom he looked for performance," requires a showing that the plaintiff had a reasonable expectation of contractual performance from the party behind the veil (allegedly, Ma). *See Rosson*, 962 So. 2d at 1286; *Buchanan*, 957 So. 2d at 980.[15]

The uncontroverted evidence on this prong was as follows. Powertrain "work[ed] with [Ma] on how many engines would fit in the shipment." Jeffery Wood Test., Trial Tr. vol. 1, at 79, Oct. 28, 2014. Ma prepared purchase orders, packing list, and invoices for the engines from Best Machinery to Powertrain. *Id.* at 83, 93, 99–100. Powertrain owner Oneal Wood signed off on all purchase orders. *Id.* at 134–35. Powertrain paid Best Machinery for the subject engines, as well as shipping and customs fees. *Id.* at 85, 101, 115, 119, 135; Purchase Orders, Pl.'s Trial Ex. 9; Emails from Ma to Powertrain, Pl.'s Trial Ex. 10; Various Emails, Pl.'s Trial Ex. 13. *See also* Purchase Orders [280-33] at 1–7. The Chinese factories shipped the engines by rail to Memphis. Jeffery Wood Test., Trial Tr. vol. 1, at 79, Oct. 28, 2014. Powertrain took possession of the engines. *Id.* No evidence supports that Powertrain believed it was paying Ma personally for the subject engines.[16] Furthermore, Ma did not state to Powertrain that she would obtain

---

factors as applied by the federal courts."). Regardless, the instant case concerns the relationship between an individual, Ma, and a corporation, Best Machinery—not a parent corporation and its subsidiary. Thus, the ten-factor test has no application to this case.

[15] This, of course, does not include other entities which may have frustrated contractual expectations (such as Champion Power Equipment and/or Tong Yong, which Powertrain could have added as defendants, but did not).

[16] The Court notes that Powertrain could not have prevailed on the theory that Ma was personally liable as the agent of an undisclosed principal. *See Thames & Co. v. Eicher*, 373 So. 2d 1033, 1035 (Miss. 1979). Best

certificates of conformity for the subject engines; nor did she sign a contract to that effect. *Id.* at 121–24, 129.

Under Mississippi law, "where parties to a transaction finally reduce its terms to an executed writing, all negotiations and previous understandings are merged into the writings[,] and the terms of the writing will control." *Rosson*, 962 So. 2d at 1286 (internal citation and quotation marks omitted). Even alleged "negligent performance of contractual duties does not justify the disregard of the corporate entity." *Id.* Because the uncontroverted evidence is that "[Powertrain] did not contract with [Ma] individually for performance or require [Ma] to guarantee the performance of [Best Machinery], [Powertrain] fails to satisfy the first prong required by *Gray* to pierce the corporate veil." *See id.*; *see also Gray*, 541 So. 2d at 1047 ("Gray admits that . . . he had no doubt he was contracting with a corporate party, not Billy Stegall or Tom Bradley personally. As a businessman himself, Gray appreciated this distinction."); *Richardson v. Jenkins Builders, Inc.*, 737 So. 2d 1030, 1032 (Miss. Ct. App. 1999) ("There is no arguable basis to conclude that Richardson either actually believed or was justified in believing that Jenkins was personally guaranteeing the contract's performance. The payment of the earnest money itself, in the form of a check payable to the corporation, indicates quite graphically Richardson's understanding of the entity with which he was dealing.").

Failure to establish the foundation of the alter-ego theory and the first *Gray* prong provided sufficient justification for judgment as a matter of law. Nonetheless, in the interest of thoroughness, the Court addresses the proof on the other two *Gray* prongs.

### (b) The Flagrant Disregard of Corporate Formalities

Machinery's name is clearly indicated on all correspondence and documentation pertaining to the sale of the subject engines to Powertrain, and Jeffery Wood testified Powertrain was aware it was dealing with Best Machinery.

24

The second *Gray* prong, "the flagrant disregard of corporate formalities by the corporation and its principals," refers to the lack of corporate separateness, for example, the failure to hold regular board meetings and maintain minutes that memorialize corporate decisions. *See GM Acceptance Corp.*, 954 F.2d at 1085. In support of this element, Jeffery Wood testified: "I've seen where [Ma] wrote checks . . . from Best [Machinery] to Champion [Power Equipment] . . . as [Best Machinery] closed," but then admitted that all the checks were signed by Lei Zhao. Jeffery Wood Test., Trial Tr. vol. 1, at 133–34, Oct. 28, 2014. Viewing this evidence in the light most favorable to Powertrain, Best Machinery may have been undercapitalized. However, "in Mississippi, undercapitalization alone is not a basis for disregarding the corporate entity." *Canadian Nat'l Ry. Co.*, 94 So. 3d at 1117 (citing *Stanley v. Miss. State Pilots of Gulfport, Inc.*, 951 So. 2d 535, 542 (Miss. 2006)). When asked "[o]ther than that, is there any evidence that you can point to that you can give to this jury to show a disregard of corporate formalities?" Jeffery Wood answered: "Not that I'm aware of." Jeffery Wood Test., Trial Tr. vol. 1, at 133, Oct. 28, 2014. No further trial evidence supports the flagrant disregard of corporate formalities. Based upon all of the foregoing, Powertrain failed to satisfy the second *Gray* prong.

### (c) A Demonstration of Fraud or Other Equivalent Misfeasance on the Part of the Corporate Shareholder

The third *Gray* prong, "a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder," is the most difficult to prove, and without it, a plaintiff cannot make its case on piercing the corporate veil. *See Whitaker v. Limeco Corp.*, 32 So. 3d 429, 439 (Miss. 2010) ("Piercing the corporate veil is predicated on a showing of fraud."). To prevail on an alter-ego pierce-the-corporate-veil theory, a plaintiff must demonstrate fraud or misfeasance on the part of the shareholder that was " 'perpetrated on someone dealing with the corporation.' "

*Tanfield Eng'g Sys., Inc.*, 97 So. 3d at 698 n.8 (quoting *Black's Law Dictionary* 86). *See GM Acceptance Corp.*, 954 F.2d at 1085 (quoting *Gray*, 541 So. 2d at 1047) ("While 'the corporate fiction will not be disregarded in cases of simple negligence,' shareholders 'may be held liable for misfeasance.' "); *Penn Nat'l Gaming*, 954 So. 2d at 432 ("[T]he corporate veil will not be pierced, in either contract or tort claims, except where there is some abuse of the corporate form itself."); *Rest. of Hattiesburg, LLC*, 84 So. 3d at 43 (citing *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 530 (D. Del. 2008) (holding under Delaware law that the type of fraud or injustice required "must be found in the defendants' use of the corporate form")). In addition, "the possibility that a plaintiff may have difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil." *Rest. of Hattiesburg, LLC*, 84 So. 3d at 40 (citing *Trevino*, 583 F. Supp. at 530).

The evidence introduced at trial was insufficient to meet Powertrain's burden on the third *Gray* prong. There was no evidence that Powertrain contracted with Ma, but there was also no evidence that Ma committed fraud by trying to use Best Machinery to shield herself from personal liability. Although the alleged subject engines Ma assisted in ordering on behalf of Best Machinery for Powertrain did not comport with EPA specifications, that fact alone does not support that Ma committed a fraudulent act or misfeasance. While there is no doubt that Powertrain incurred civil penalties and other damages as a result of trying to introduce into commerce noncompliant engines, these problems were not answerable by Ma individually because Powertrain offered no proof that Ma abused the corporate form in committing any alleged fraud or misfeasance.

At one point in the trial, Jeffery Wood was asked: "You're not aware of any fraud that [Ma] committed while she was working on Powertrain's behalf and finding engines to buy,

right?" Jeffery Wood Test., Trial Tr. vol. 1, at 121, Oct. 28, 2014. As stated above, Jeffery Wood testified: "I've seen where she wrote checks . . . from Best [Machinery] to Champion [Power Equipment] . . . as [Best Machinery] closed," but then admitted that all the checks were signed by Lei Zhao. *Id.* at 133–34. Also, as stated above, testimony that Ma was involved in the writing of checks from Best Machinery to Champion Power Equipment as Best Machinery closed—but did not actually sign the checks—was an insufficient basis for disregarding the corporate entity under Mississippi law.

When asked if Ma committed any specific acts of fraud in the process of ordering, shipping, and payment for the importation of engines, Jeffery Wood testified, "Not to my knowledge." *Id.* at 121. Jeffery Wood then testified: "I believe if you look at all of the documents you can see the trust and faith that we had in her" and that Ma did a good job for Powertrain other than her failure to obtain the certificates of conformity for the Tong Yong engines. *Id.* at 121–23.

The record is bereft of evidence that Ma represented that she would obtain a certificate of conformity for the engines purchased by Powertrain, and instead, supported that Powertrain had the responsibility for obtaining the certificates of conformity for its engines before introducing them into commerce. As background, the Court notes that under federal law new nonroad engines cannot be sold or imported unless covered by a certificate of conformity issued by EPA verifying that the engine satisfies the appropriate emissions standard. *See* 42 U.S.C. § 7522(a)(1); 40 C.F.R. § 89.1003(a)(1)(i)–(ii). For each model year, a certificate covering the "engine family" must be obtained prior to sale or importation. 40 C.F.R. § 89.105. Manufacturers are prohibited from selling any covered engine that does not bear a permanent

emission control information label verifying that the engine conforms to these requirements. 42 U.S.C. §§ 7541(c)(3)(C) & 7522(a)(4)(A); 40 C.F.R. §§ 89.110 & 89.1003(a)(4)(ii).

At trial, Powertrain's expert witness, Christopher Weaver, a mechanical engineer specializing in emissions, testified that "[i]t is normally the responsibility of the manufacturer or the importer to place th[e] EPA-certified sticker on the engine" and that when an engine is for sale in the United States but is imported into this country it must have the EPA-certified sticker on it before it comes into the country. Christopher Weaver Test., Trial Tr. vol. 2, at 75–76, Oct. 29, 2014. Christopher Weaver further testified that the person who obtains the certificate of conformity is considered the manufacturer for EPA's purposes, whether that person actually built the engine or not, *id.* at 85; and that physical shipment of the engine to a location in the United States, as well as arranging all of the import documentation, including the customs declarations, is part of the process of importing an engine, *id.* at 88.

Taking this testimony as true, no evidence supported that Ma was the manufacturer or importer of the subject engines or that she otherwise had a duty to obtain the certificates of conformity for the subject engines and that her alleged failure to do so constituted fraud or misfeasance. Jeffery Wood testified that Powertrain was aware that to import engines from overseas and sell them in the United States the engines had to have a certificate of conformity. When asked about Ma's alleged responsibility to obtain the certificates of conformity with respect to the Tong Yong engines, Jeffery Wood testified that he was not aware of any contract Ma signed indicating that she agreed to provide the certificates of conformity for the engines—or any other contract with Powertrain; that he did not "particularly remember" whether Powertrain and Ma discussed the EPA certificates with respect to Tong Yong; that "[Ma] told [Powertrain] she would take care of everything with the new company, that we wouldn't have to do anything,"

but that Ma did not specifically indicate that involved getting certificates of conformity for the engines from Tong Yong; and that he did not investigate whether Ma would obtain the appropriate certificates of conformity for the subject engines beyond just assuming that Ma would be getting those certificates of conformity. Jeffery Wood Test., Trial Tr. vol. 1, at 121–24, 129, Oct. 28, 2014. Although Powertrain argues in its motion for new trial that Ma "ensured certificates were affixed to each engine imported," *see* Pl.'s Mem. Br. Supp. Mot. New Trial [280] at 4, no evidence or testimony at trial supported this statement.

Powertrain produced evidence that Ma requested information from V. Alexander & Co., Inc., Import Traffic Specialist, about "documents needed for importing." *See* Ma Email to Chris Varias, Pl.'s Trial Ex. 12, at 3 (Bates #00008798). However, aside from establishing Ma's involvement in the process of obtaining the subject engines, the trial evidence supported that Powertrain and/or the Chinese factories were the manufacturers of the engines purchased by Powertrain from Best Machinery and that Powertrain was the importer. On every EPA form introduced into evidence at trial, the importer of the subject engines was listed as either Wood Sales Co. Inc. or Powertrain, Inc. and the manufacturer of the subject engines was listed as Powertrain, Inc. *See* EPA Decl. Forms, Def.'s Trial Ex. 6, at 1–20 (Bates #00008078–#00008197) (listing name of relevant party as "Oneal Wood," the engine importer as "Wood Sales Co. Inc.," the broker as "V. Alexander," and the owner as "Wood Sales Co. Inc."); EPA Engine Decl. Forms, Pl.'s Trial Ex. 3, at 35–36 (Bates #00001010–#00001011) (listing name of relevant party as "Oneal Wood," the engine importer as "Powertrain, Inc.," the broker as "V. Alexander," and the owner as "Powertrain, Inc."). *See also* Bionetics Letter & Nonroad Inspection Report, Powertrain to EPA, Pl.'s Trial Ex. 3, at 7, 8 (Bates #0000982, #0000983) (listing engine manufacturer as "PowerTrain, Inc." and the engine importer/dealer as

"PowerTrain, Inc" [sic]); EPA Nonroad Field Inspection of Engines, Pl.'s Trial Ex. 3, at 33 (Bates #00001008) (listing facility as "Power Train Inc." and facility type as "importer"); EPA 2003 Certificate of Conformity, Pl.'s Trial Ex. 4, at 6–7 (Bates #0000651–#0000652) (listing manufacturer of particular nonroad engine family "3PTIS.1632P1" as "Powertrain, Inc.," contact person as "Mr. Oneal Wood," and production plant as "Powertrain, Inc."); EPA 2004 Certificate of Conformity, Pl.'s Trial Ex. 4, at 22–23 (Bates #0000666–#0000667) (listing manufacturer of particular nonroad engine family "4PTIS.1632P1" as "Powertrain, Inc.," contact person as "Mr. Oneal Wgood" [sic], and production plant as "Powertrain, Inc."); EPA 2005 Certificate of Conformity, Pl.'s Trial Ex. 4, at 37–38 (Bates #0000681–#0000682) (listing manufacturer of particular nonroad engine family "5PTIS.1632P1" as "Powertrain, Inc.," contact person as "Mr. Oneal Wood," and production plant as "Powertrain, Inc."); EPA 2006 Certificate of Conformity, Pl.'s Trial Ex. 8, at 2, 12 (Bates #0000249, #0000259) (listing manufacturer of particular off-road engine family "6PTIS.1632P1" as "Powertrain, Inc.," contact person as "Mr. Oneal Wood," and production plant as "Powertrain, Inc."). *See also* EPA Engine Decl. Forms [280-28] at 1–8.

Jeffery Wood testified that Powertrain was listed as an importer of the subject questions on importation documents because that is what Ma advised, and that Ma filled out the documents and sent them to Oneal Wood to be signed. Jeffery Wood Test., Trial Tr. vol. 1, at 101, Oct. 28, 2014. However, as Jeffery Wood testified, it is undisputed that Oneal Wood signed off on every one of the importation documents. *See id.* at 134–35. No evidence supported that Ma was ever listed as importer of the engines or that she ever signed a form listing herself as an importer of the subject engines. *Id.* at 132. Furthermore, no evidence supported that Ma ever referred to herself as the importer or manufacturer of the subject engines.

Trial evidence further supported that Powertrain had the ultimate responsibility for obtaining certificates of compliance for the engines it purchased from Best Machinery. *See, e.g.*, *id.* at 77–78 (Before Everfine engine could be sold, "[Ma] needed someone to help her with getting the EPA approval on the engine. . . . [Powertrain] contacted [Powertrain's attorney, Thomas] Keenum, told [Ma] we would check on it [to] see if we could help with it. [Keenum] took care of it from there."); 1/23/2002 Email from Ma to Jeffery Wood, Pl.'s Trial Ex. 11, at 1 (Bates # 00001910) ("Please let me know if you are preparing for the EPA approval for our engine[.]"); Consent Decree, *United States v. Powertrain et al.*, No. 1:09-cv-993, Pl.'s Trial Ex. 1 at 3[17] (EPA had alleged that Powertrain "imported, or caused the importation of, and sold or otherwise introduced into commerce, engines that were not validly covered by certificates of conformity . . . All of the engines were manufactured by companies located in the People's Republic of China and imported into the United States by Defendants.").

In addition, uncontroverted evidence introduced at trial showed that Powertrain owner Oneal Wood was involved in obtaining the certificates of conformity for the time period at issue in this case: 2002–2006. Ed Langford, an employee of Environmental Solutions Worldwide, Inc. ("ESW"), stated in his affidavit:

> [O]ne of my customers was PowerTrain., Inc. . . . I dealt with Oneal Wood and Jeffery Wood with regard to PowerTrain engines. . . . I am generally aware that a certificate of conformity for the PT550 engine was issued in 2002 . . . . I first became involved with PowerTrain in 2005 as they were filing for a renewal of their existing certificate of conformity, on a "rollover" basis—that is, recertifying the PT550 engine based on the 2002 data. On this project, I worked with a Mr. Tutor, who I understand is an attorney who represents PowerTrain. . . . Sometime in early 2006, I was contacted by Oneal Wood about obtaining certificates of conformity for other PowerTrain engines besides the PT550 which was the subject of the 2002 testing. . . . [T]here was some discussion with Oneal Wood about the possibility of using the

---

[17] Plaintiff's Trial Exhibit 1 has no corresponding Bates labels.

> [Tong Yong] EPA certifications for the PowerTrain engines. . . . I
> advised [Oneal Wood] that the [Tong Yong] certificates could not
> be used . . . . Having determined that the [Tong Yong] certificates
> could not be relied upon by PowerTrain, Oneal Wood authorized
> us to move forward with emissions testing on the PowerTrain
> engines.

Langford Aff., Pl.'s Trial Ex. 4, at 1, 2 (Bates #0000646, #0000647). *See also* Bontekoe Report

Addendum, Pl.'s Trial Ex. 5, at 3–4 (Bates #0000592–#0000593) ("PowerTrain changed the

manufacturer of the PT550 engine from Everfine to . . . [Tong Yong]. . . prior to the submission

of the carryover requests to certify the PT550 engine for the 2003, 2004, 2005 model years. The

carryover certificates were issued by EPA based on this incorrect information. . . .

Consequently, it was not legal for PowerTrain to import, market, or sell the PT550 engines under

the Certificates for 2002, 2003, 2004[,] and 2005.") Letter from Katherine T. Gates, an attorney

for Powertrain, to IDS Labs, Pl.'s Trial Ex. 7, at 64 (Bates # at 000077) ("Power[t]rain retained

IDS Labs . . . to perform emissions testing and assist in preparing applications for certificates of

conformity for PowerTrain engines," apparently in 2002 and 2003).

Although the certificates of conformity for the subject engines did not comply with

EPA standards and Ma on behalf of Best Machinery was at least partly involved in the process of

obtaining the engines, this does not mean Ma committed acts amounting to fraud, nor does it

mean that the problems are answerable by Ma individually. *See Rosson*, 962 So. 2d at 1288. In

*Richardson*, the Mississippi Court of Appeals held that the fraud element was not present where

"Richardson presented no evidence that Jenkins, from the beginning, was intent on obtaining

Richardson's money for his own personal use with no intention of performing on the contract

and that he used a shell corporation to shield himself from personal liability on the day of

reckoning that was inevitably to come." 737 So. 2d at 1032. Similarly, in this case, there is no

evidence that Ma used Powertrain's money for her own personal benefit or that Ma was using

Best Machinery as a shell corporation as a shield from personal liability. *See Rosson*, 962 So. 2d at 1288.

According to Jeffery Wood's testimony, Ma recommended Chinese factory Tong Yong to Powertrain, and Ma represented to Powertrain that she worked for and with Tong Yong, that Tong Yong made engines, and that her family had some interest in the factory. Jeffery Wood Test., Trial Tr. vol. 1, at 83, 86, 88, 114, Oct. 28, 2014. Powertrain's evidence further shows that Powertrain ceased its relationship with Everfine and began to do business with Tong Yong, based on Ma's recommendation—though Powertrain's decision to do so was voluntary. *Id.* at 86, 92; *see id.* at 114 ("We could have determined we didn't want to follow [Ma]'s advice, but based on [Ma]'s advice and her working with the factories, we decided to follow what she suggested."). Perhaps Powertrain followed this advice to its detriment. However, "[i]t was within [Powertrain]'s power to investigate the financial strength and prior business dealings of [Best Machinery] and take appropriate means to safeguard against the ever-present possibility of non-performance by that corporation. That [Powertrain] did not is no reason to extend [Best Machinery]'s liability to [Ma] acting on behalf of [Best Machinery]." *See Richardson*, 737 So. 2d at 1032. In sum, Powertrain "has put forth no proof that [Ma] perpetrated upon it any fraud." *See Gray*, 541 So. 2d at 1048.

The Court reiterates that Champion Power Equipment and Tong Yong, Ma's family's factory in China, are not parties to this case. Because neither Champion Power Equipment nor Tong Yong were served with process or named in this suit, neither Champion Power Equipment nor Tong Yong can be held liable. *See Nash Plumbing, Inc. v. Shasco Wholesale Supply, Inc.*, 875 So. 2d 1077, 1082–1083 (Miss. 2004) (citing *Paepcke-Leicht Lumber Co. v. Savage*, 101 So.

709, 711 (Miss. 1924)).  For the same reason, Ma cannot be liable as an alter ego of Champion

Power Equipment and Tong Yong in the case *sub judice*.

Finally, the Court briefly addresses Powertrain's argument that its claims for negligence,

breach of warranty, and breach of contract against Ma individually existed separately from its

pierce-the-corporate-veil theory.  Based on all of the foregoing, that argument has no merit.

Powertrain failed to lay the necessary pierce-the-corporate-veil foundation on its claims against

Ma.  If this Court had nonetheless allowed those claims to go to the jury without piercing the

corporate veil of Best Machinery, this Court would have done so in error.

With respect to Powertrain's breach-of-contract claim against Ma, the Mississippi

Supreme Court's words from the seminal *Gray* case are particularly poignant:

> Where, in the context of an action for breach of a lease or other
> consensual undertaking, a party seeks to pierce the veil of the
> corporation with whom he has contracted and to hold the
> shareholders personally liable, our focus is fixed upon the
> expectations of the parties in concluding the bargain.   Since
> contract liability arises from an essentially consensual relationship,
> courts generally decline to disregard the corporate entity, choosing
> instead to enforce the contract as written.
>
> . . .
>
> The attempt to hold another party liable where the claim asserted is
> of contractual origins presents difficulties. The question which
> must be met and answered is why one who contracted with a
> selected party and received the promise he bargained for should be
> allowed to look to another merely because he is disappointed in the
> selected party's performance. The answer under contract law is
> that he may not hold the other liable without additional compelling
> facts.

541 So. 2d at 1046, 1047.  In the case *sub judice*, as in *Gray*, the plaintiff (Powertrain) complains

that the defendant (Ma) was the individual whose actions for Best Machinery offended Best

Machinery's obligations under any contract between Powertrain and Best Machinery.  *See id.* at

1047. However, also as in *Gray*, "[a]s [an] agent[] for a disclosed principal, [Ma] incur[s] no individual liability, absent fraud or other equivalent conduct." *See id.* Because the record is bereft of any evidence of a contractual relationship between Powertrain and Ma, to have held Ma liable on any contract between Powertrain and Best Machinery would have required piercing the veil of the corporation with whom Powertrain contracted—Best Machinery—a result not justified in this case. Therefore, Powertrain's breach-of-contract claim against Ma fails. With respect to Powertrain's claims against Ma for negligence and breach of warranty, the Court notes that "the legal precepts governing both tort and contract suits are substantially the same," and thus, that Powertrain's failure to present proof on its pierce-the-corporate-veil theory was fatal to those claims, as well.

It is rare indeed for this Court to grant a Rule 50(a) motion for judgment as a matter of law at the close of a plaintiff's proof. However, this Court is of the opinion that such a ruling was warranted in this case, particularly given the strictures of Mississippi law on the claims presented in this diversity suit. The Court further finds that Powertrain has failed to show that a new trial should be granted pursuant to Rule 59.

### D. Conclusion

For all of the foregoing reasons, the Court finds that its judgment in favor of Defendant Joyce Ma against Plaintiff Powertrain, Inc. is fully sustainable and that Plaintiff Powertrain, Inc. has failed to persuade this Court that a new trial is warranted. Accordingly, Plaintiff Powertrain, Inc.'s motion for new trial [279] is DENIED.

An order in accordance with this opinion shall issue this day.

THIS, the ___17___ of February, 2015.

_____
SENIOR U.S. DISTRICT JUDGE